Nelson, J.,
delivered the opinion of the Court.
The complainant executed a deed of conveyance, bearing date 8th December, 1862, to Larkin W. and Elijah R. Hammons, minor children of C. A. Hammons, for the tract of land therein described, situate in Cannon county, and containing 65 acres and two rods, more or less, by estimation, as stated in said deed, for the consideration of nine hundred dollars; of which amount, the deed recites that eight hundred dollars had been paid, and the *138 balance of oñe hundred dollars secured by the note of C. A. Hammons to the said L. W. and E. E. Ham-mons, due and payable 25th December, 1863, and for the payment of which, a lien is retained on the face of the deed. The payment of eight hundred dollars was made in Confederate Treasury notes; and the object of the original bill, filed 24th April, 1866, and of the amended bill, filed 14th March, 1868, when considered together, is in brief, to have the deed annulled for failure of consideration, and because it is alleged the same was obtained by fraud and duress.
It appears from the record, that, during the late civil war, and up to the time of the execution of said deed, Cannon county was in possession, or subject to the control, of the Confederate military forces; and that the following order, issued by a military officer in command,was printed as a circular or hand-bill, and generally posted throughout the country, viz:
“ Headquarters Cavalry Brigade, 1 “McMiNNville, July 25, 1862. J
“Any person who shall refuse to receive Confederate money, or shall say or write anything to depreciate the same, shall be subject to a fine and imprisonment, or confiscation of property, either or both, as the nature of the case may indicate. The asking of exorbitant prices for goods, or the commodities of life, such as would indicate a want of confidence in Confederate money, is prohibited; and any person so offending, shall be subject to fine and imprisonment, or confiscation of property, either or both, as the nature of the cate may. indicate.
“N. B. Forrest,
“ Brig.-Gen., Commanding Brigade.”
*139 This order, it seems, was actively circulated throughout the country, and occasionally enforced, through the soldiery, by threats and arrests; and, for fear of the consequences, many persons received Confederate notes who would not otherwise have done so. According -to the weight of evidence, the complainant was a Union man, and C. A. Hammons a Rebel, who had been hired as a substitute in the Confederate army.
Hammons, expecting to be soon put upon active duty, and, perhaps, to be engaged in the then approaching battle of Murfreesboro, became anxious to purchase the complainant’s land, and to have it conveyed to his children, either to protect it against his creditors, or to provide for the possible contingency of his early death. Certain parol negotiations occurred between him and the complainant, from which it was manifest that the complainant, who was somewhat embarrassed in his circumstances, was quite unwilling to receive Confederate notes in payment, yet fearful to risk the consequences of a direct and positive refusal. Hammons, on the other hand, was equally determined to avail himself of the well grounded apprehensions of complainant, to take advantage of the circumstances which surrounded him, and to extort, from his fears, a conveyance of the land. Having received one thousand dollars, in Confederate notes, either for his services as a substitute, or as an agent to purchase hogs, he invested a portion of the money in that way, and told one of the witnesses, in substance and with an oath, that complainant had agreed to sell him the land, and that he would compel him to do so. He went to the house of complainant, who was engaged at the time in shoemaking, *140 and proposed to give nine hundred dollars for the land in Confederate money. Complainant refused to take it. In the language of the witnesses, Hammons “then pulled out eight hundred dollars in Confederate money, and laid it on the lapboard.-” Complainant told him not to lay his money down there until he saw further about it. Defendant remarked that if they were going to make the trade, then was the time to make it; said repeatedly that, if the money did not answer all purposes, he would take it back, or make it as good as gold and silver; and, after he laid the money upon the lapboard, observed that “if a man refused to take this Confederate money, just report him to Gen. Forrest, and he would hang him four feet from the ground.” He went off' and left the money lying upon the lapboard; and the complainant afterwards executed the deed. It does not clearly appear how long the fears of complainant, thus produced, existed before signing the deed, but one of his daughters, proves that these fears continued “a right smart while — a month or two;” and that Hammons kept making his threats as long as he was a soldier, which was about that length of time. This witness states that she stayed with Hammons’ wife about five weeks, “while he was a soldiering,” and that while she remained there, he came home every day, with the exception of one week, during which he remained away.
One witness, who does not appear to be related to either of the parties, proves that in the Fall of 1862, he, the witness, was “backward about taking Confederate money, and Col. Hardy said to me, - (him,) ‘if you refuse to take that money I will carry you to headquarters quicker than you ever went;’ and the penalty for *141 refusing Confederate money is, tbey bang them four feet clear from the ground.” Another witness proves that the cavalry, belonging chiefly to Forrest’s and Morgan’s commands, were “round there” in 1862; that they were passing through the country “frequently, every few days,” and made threats that if the people refused to take Confederate money, Forrest would either confiscate their property or take them off and hang them. Yet another witness testifiess that he was present when the order of General Forrest was posted up; that he saw orders similar to it “posted up around through the country;” that the soldiers who posted the order did not say a great deal about it, but did say that “the orders were strict, and the people saw their doom if they disobeyed them.” Other witnesses prove' that there was a general state of fear throughout the country; that the people generally were afraid to refuse Confederate money, and that they (the witnesses) received it through fear. This part of the evidence was properly objected to.
In the case of Rollings v. Cate,[1] determined at the recent term of the Supreme Court at Knoxville, we held 'that a 'mere general fear of offending the Confederate Government, by refusing to take Confederate Treasury notes in payments, could not be imputed as duress in private transactions, where no threats or force were employed, and that in order to constitute duress in its legal sense, it must appear that the party acted under some threatening of life, or member, or of imprisonment, or some imprisonment or beating of the party *142 acting, or of his wife, with a view to procure the execution of the deed or other instrument, and that the danger existing or threatened, should affect the person or goods or property. In that case, there was no proof of beating, imprisonment or threats; no proof of any military order; no other or higher evidence than a vague, indefinite and .unsatisfactory statement that there was “& general state of fear among Union men in regard to disobeying rebel rule, or refusing to take their money; and many Union men had been arrested;” which hearsay statement was objected to and held to be inadmissible in evidence.
But there is a marked distinction between that • case and the ease now under consideration. Here, a stringent-military order is established by proof. Here, it is shown that the order was published throughout the country. The order, itself, contains a threat of fine, imprisonment and confiscation. It was issued by an officer of high rank, and circulated by soldiers who were in arms. It was not a mere brutum /ulmén, but was vigorously executed, and created general trepidation and alarm. The defendant, Hammons, himself a soldier, artfully turned the order to his own private' and personal advantage. He did not use it in aid of the cause which he had hired himself to support as a soldier, but employed it as a means of coercion, to compel a contract which he could not otherwise have obtained; and, with the view of arousing to the greatest extent the fear of his victim, actually misrepresented it, and threatened, with it and by its assumed operation, the life of the complainant, and not merely his imprisonment or the confiscation of his property. Con- *143 tinning to hold that vague and indefinite fears, which might have. been common to all the citizens, are not sufficient to invalidate private contracts, we hold, also, that when a military order, such as has been proved in this case, was directly appealed to, and employed as a threat, or means of coercion, by one citizen against another, and h'is. personal fear- was thereby, aroused and excited, so as to compel him to .make a contract, or do an act which he would not have done but for such personal fear, such •contract, or act, is utterly null and void.
'From the evidence in this case, we have no doubt that the complainant executed the deed under the fear of death, or at least of imprisonment or confiscation; and, although it is not in proof that at, or immediately before, the -precise moment of signing the deed, any threat was made, we are satisfied from .the facts and circumstances appearing in the record, that the defendant did, in the first instance, by his threats, arouse the fear of death, imprisonment or confiscation; that he never disabused or sought to disabuse the mind of complainant of the impression thus created; but, on the contrary, continued from time to time, to deepen and enlarge them; and that the ■fear: thus created and continued was present and existing when complainant executed the -conveyance. The Confederate notes were left with him forcibly, and against his will, and in despite of his timid but earnest remonstrance. While he held only a title bond for his land, Hammons was the busy and active agent in- employing his own counsel to prepare a deed to complainant in its place, and also .to prepare a deed from complainant to his (Ham-mons’) two minor sons, who had no agency. in procuring *144 it. He removed into the house on the premises before the complainant and his family had left it, where, it may be fairly presumed, he conducted himself with domineering insolence, and is expressly proved, he declared that complainant had been trying to get him to take the money back, but swore, with a blasphemous oath, that he did not intend to do so, and significantly announced, that “when he made a trade he made it.” After complainant had removed from the houses, and probably after the Confederate forces had left the country, Hammons stated in the hearing of one of the witnesses, that “if the Rebs would come back, he had the other hundred dollars for old man Bogle,” meaning, doubtless, that he would compel him to receive it in Confederate notes; as he had forced him to receive the eight hundred dollars.
Aside from the question of duress, it is apparent, from the evidence, that the defendant, Hammons, who was insolvent before he received the one thousand dollars' in Confederate notes, perpetrated a fraud upon complainant, in assuring him that they were as good as gold; in promising him to take them back if they could not be used in the payment of his debts, and in refusing to do so when complainant offered to return them. It has been earnestly contended, in argument, that complainant did use $405 of the Confederate “money” paid to him by Hammons, in a payment to Stone, administrator of Ranes, from whom the land -was originally purchased; but although it is in proof that Hammons was present at the time, or upon the day when the payment was made, it is not shown by the declarations of the parties or otherwise, that the “money” so paid was any part of *145 the-fund left by or received from Hammons; and it is in •proof' that complainant had ’received Confederate “money” from, other sources. The witnesses -do not testify as to thé precise amount, but say -that he had “a great roll of it;” and as that species of currency .was quite abundant, it is inore than probable he had acquired enough from other- sources. It is also in proof that complainant spoke' of investing the Confederate money in cattle and other stock, and that he made some -small investment's, and admitted that one hundred dollars of the amount had been received from Hammons. As the complainant did not tender the Confederate money received from Ham-mons with his bill, or at any time in the progress of the cause, it is quite probable he used the same or a part thereof, although it is shown that he had Confederate “money” on hand at the close of the war.
A "tender of the Confederate “money,” however, at or since the commencement of the suit,, would have been an idle ceremony, as it had become utterly worthless. But it is in proof that at the time *of the contract Confederate notes had a marketable or commercial value; and although it was small, it is-equitable .and just that as complainant does not show what became of the Confederate' money he received, he should account for its value at' the time he received it, and that defendant, Hammons, should account for the rents', and profits of the' lands, minus the value of any betterments, actually enhancing its value, which he has placed upon it since he took possession.
Other propositions have been vehemently urged in argument by the defendants; but after a very- careful exam- *146 inatioii of this voluminous record, and all the evidence, relevant and irrelevant, contained in it, we are unable to perceive that the credibility of any of the witnesses has been successfully assailed. There is no proof as to the general character of either of them, and the legal presumption is that all have testified to the truth. It would be useless to repeat here the names of the witnesses, or to particularize the statements which have been assailed. The evidence of persons who have been examined under oath can not be impeached,, as seems to be the effort in this case, by showing trivial discrepancies as to collateral matters, especially when the witnesses examined for the purpose do not themselves make positive statements, and admit their own want of accurate recollection as to the facts. Nor can the positive statement of a witness that he heard a particular conversation, be disproved, as was attempted, by the statement of another witness that he'was present but does not remember whether it occurred or not. Nor can the loose conversations of witnesses, which seem to be at variance with their depositions, be regarded as successfully impugning their veracity, without first calling their attention, as nearly as possible, to the time, place and circumstances of the supposed conversation, so as to give them an opportunity for explanation.
Let the decree of the Chancellor be affirmed, with the modifications above indicated.

 1 Heis., 97.